UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LYNDA LYNK,

                    Plaintiff,                           Case No. 07-14772
                                                           Honorable David M. Lawson

v.

CHASE HOME FINANCE, LLC,

                    Defendant.

_____/

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION TO AMEND
HER COMPLAINT AND GRANTING IN PART AND DENYING IN
PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The plaintiff filed a complaint in state court alleging that the defendant, a mortgage company, violated the Fair Credit Reporting Act and various state laws by falsely reporting to credit reporting agencies that the plaintiff had filed for bankruptcy. The effect of the erroneous information, the plaintiff alleges, was that the plaintiff was prevented for a time from refinancing her home mortgage with another lender, making her a captive to the onerous interest rates and payment schedules demanded by the defendant. After the case was removed to this Court, the plaintiff filed an amended complaint, and now she has filed a motion seeking leave to amend the complaint once again. Meanwhile, the defendant filed a motion to dismiss or for summary judgment and opposes the later-filed motion for leave to file a second amended complaint. On June 8, 2009, the Court heard oral argument on the motions. The Court now finds that the liberal amendment policy expressed in the Federal Rules of Civil Procedure favors the plaintiff's motion to file a second amended complaint. However, even with the amendments, the plaintiff's claims fail as a matter of law, except part of the claim stated in count I brought under the Michigan Collection Practices Act. Therefore, the Court will grant the motion to file a second amended complaint, grant in part and

deny in part the defendant's motion for summary judgment, and dismiss all counts of the second amended complaint except for a portion of count I.

I.

The plaintiff alleges that in 2002, dire family circumstances forced her to refinance her home mortgage: her husband was killed in a car accident in 2001, and she was left with two small children and began to struggle financially.  She refinanced her home through Aegis Mortgage Corporation under an arrangement that allowed her to take some additional cash for home repairs, but she believed that her monthly payments would not change.  A few days later, Aegis assigned the mortgage to Chase, the defendant in this case.  The plaintiff soon realized that her payments under the new mortgage did not include escrow payments for taxes and insurance and her mortgage had an adjustable rate of interest.  Although in December of 2002 she signed and initialed each page of the Adjustable Rate Note, which outlined the interest rate and monthly changes in upper case script, the plaintiff claims that she became aware of the added obligations for the first time in late 2005.

The plaintiff contends that Chase attempted to collect additional payments to cover the escrow through a series of "repeated harassing phone calls" to the plaintiff.  Second Am. Compl. ¶ 7.  When the additional payments were not made, Chase adjusted the plaintiff's mortgage to a rate of 12.299%, doubling the plaintiff's mortgage payments from $1,200 to $2,400 a month, an amount well beyond her means.

With her financial situation turning more difficult, the plaintiff says she considered filing for bankruptcy protection but did not do so because she could not afford to pay the filing fees.  Mot. for Summ. J., Ex. 1 (Lynk Dep.) at 18-20.  She testified that she spoke with numerous credit counseling agencies, but obtained no relief.  *Id.* at 19. In the spring and summer of 2006, the plaintiff sought

-2-

to refinance yet again.  She first contacted Access Mortgage, which refused to refinance her loan because the house was appraised at a lower than expected value.  Next, in May of 2006, she contacted a company called Wilmington Mortgage (which she also referred to occasionally as "Remington" Mortgage), which also declined to refinance, informing her for the first time of a bankruptcy notation on her report.  She also applied to Stratford Funding, which declined.  Finally, in September of 2006, she contacted SurePoint Lending.  A representative of SurePoint Lending advised her that "Chase is saying that you're in bankruptcy," and declined to assist with refinancing as well.  Lynk Dep. at 37.

The plaintiff testified that initially she dismissed the rumors of bankruptcy, but then noticed the recurring assertions of bankruptcy from different lenders.  She described a conversation with a representative of Wilmington Mortgage in May of 2006, and with Stratford Funding in July:

> The guy's name was Mike.  Okay.  He said something to the effect that, you know – I told him my credit score up front and he said that's no problem.  Then when he got my report, he said something to the effect bankruptcy will be a problem.  You know, he was nasty and he basically hung up on me. . . . So I dismissed it, you know, I just dismissed it, you know.  I'm not in bankruptcy, what is he talking about.  So I tried to fix some more things on my credit – in my home, so I could get a higher appraisal.
>
> Then I tried again in July.  This time it was Stratford Funding and the guy's name was Brian, that's G-I-E-R-I-N-G.  Okay.  He just snubbed me, you know.  So I'm saying okay, what's going on.  Access in March and April, you know, eager, excited.  I had two companies in March and April fighting over me.  I can't remember the name of the second company, but it would be on my phone records.
>
> Okay.  So in July with Stratford I tried again.  Again, this guy, after he gets my credit repots, he just blow [sic] me off.  He just nasty, too; he just blows me off.  I said something is wrong here.

Lynk Dep. at 25-26.

The plaintiff states that she contacted Chase on September 26, 2006 to demand that it remove references to bankruptcy from her credit report. Before contacting Chase, the plaintiff had not contacted any of the reporting agencies, claiming that she had "no clue how to deal with a credit reporting agency," and was skeptical that disputing the records directly with the credit reporting agency would bring any results. Lynk Dep. at 80. The plaintiff now seeks to qualify this statement in her proposed second amended complaint by alleging that a Chase employee discouraged her from contacting TransUnion (the only credit reporting agency that apparently reported the errant bankruptcy notation) directly. She states that she hired a law firm, Lexington Legal, that contacted TransUnion on her behalf, but the records of the company indicate that Lexington did not contact TransUnion until April 21, 2007, well after the plaintiff called Chase about the bad information. Pl.'s Response to Def.'s Mot. for Sum. Jmt., Ex. D (Letter from Lexington to Lynk).

The plaintiff alleges that a Chase representative conceded that the mistake occurred because "Chase was under the impression that Plaintiff was 'thinking' or 'talking about' filing for bankruptcy." Second Am. Compl. ¶ 12. However, it was not until March 2007 that Chase instructed the credit bureaus to remove the references to bankruptcy.

Chase contends, however, that it had never supplied any report of bankruptcy to the reporting agencies, and the notation on the plaintiff's credit report was TransUnion's – and not the defendant's – mistake. Chase states that its "detailed system notes, records, and policies" contain no reference to Lynk's bankruptcy, and their own research into Lynk's credit report did not reveal that Chase had furnished any information regarding bankruptcy to the credit bureaus. Chase produced a copy of the plaintiff's credit reports from the three major credit reporting agencies, and only the TransUnion report contained a notation that the plaintiff's loan with Chase was in bankruptcy. Chase argues that

-4-

if it provided any information to the credit reporting agencies, it would have provided this information uniformly to all three agencies.  Further, Chase states that its internal practice is to refer the loan included in bankruptcy to a "specific bankruptcy department," retain outside counsel to protect Chase's interests, and make a special notation in its system notes.  Mot. for Summ. J., Ex. 2 (Reardon Aff.) at ¶ 20.  The bankruptcy-related routine is described as follows:

> 21.  As for the system notes, if Chase were furnishing information to the credit reporting bureaus that a loan was "included in bankruptcy," it would be Chase's regularly conducted business to utilize and rely on the system notes by making the following notations: (a) an auto generated "BANKO" entry statement showing chapter (either chapter 7 or 13), case number, filing date, court of jurisdiction and the name of filer(s); and (b) an auto generated bankruptcy protection to populate the fields in the system to notify Chase employees to refrain from calls to the borrower and/or to stand down on foreclosure/eviction efforts (had such procedures been implemented) to avoid potential violations of the bankruptcy automatic stay.

> 22.  Furthermore, in cases where a bankruptcy has been filed, the loans are moved into a special service module, Derivative Research Interface, where only default loan specialists (bankruptcy, foreclosure, REO, loss mitigation and litigated services) have access to the files. In other words, the loan is transferred to a separate system and a restricted set of system notes would be created.

> 23. Finally, any time that a Chase loan is associated with a bankruptcy filing, it would be Chase's regularly conducted business activity to, much like it does with the system notes, memorialize that fact via the AUD. Specifically, the AUD would contain a conspicuous notation, an alpha character, as opposed to a number or "-,'" for any month that the loan was in bankruptcy and that Chase was furnishing that information to the credit reporting bureaus.

*Id.* ¶¶ 21-23.  The defendant claims that its system notes do not contain any reference to the bankruptcy either.  *Id.* ¶ 24.

-5-

The plaintiff says she made multiple requests of Chase to correct the record and received notices that Chase was without power to amend any information because it had not furnished bankruptcy information in the first place.  During that time, the parties communicated with each other on almost a hundred occasions – forty-seven times initiated by the plaintiff and forty-six times by the defendant – although only two out of forty-six calls from Lynk to Chase were about the bankruptcy notation.  Reardon Decl. ¶ 16-17.  Finally, on March 13, 2007, a Chase representative wrote to the plaintiff as follows:

> Thank you for your recent request that Chase received to update information on your credit report for your loan referenced above.
>
> Chase sent an electronic notification to the major credit agencies (Equifax, Experian, Innovis, and TransUnion) requesting that they remove all references to being included in bankruptcy from your credit history.  This letter is confirmation that Chase requested the amendment to your credit profile.  Please allow time for the credit agencies to update your information.
>
> I apologize that we did not meet your expectations.  Chase's goal is to provide the highest level of quality service to each of our customers.

Compl., Ex. A (Letter from Theresa Ritzer to Linda Lynk, March 13, 2007).  On the same day, another Chase employee sent an electronic notification to the major credit reporting bureaus asking them to remove all references to the bankruptcy.  The defendant claims this was done "as a matter of courtesy and to appease Lynk's request."  *See* Reardon Decl. ¶ 14.  It appears that the plaintiff's credit report no longer contains a reference to bankruptcy.

Eventually, the plaintiff was able to refinance her loan with another bank.  In February 2007, Lynk was able to obtain a thirty-year fixed loan with the interest rate of 10.9 percent (possibly reduced to nine percent in the future) through CitiFinancial.  Ms. Lynk speculated that she was able to obtain a loan with CitiFinancial because CitiFinancial did not rely on the TransUnion's report:

-6-

Q. When you were obtaining the loan did [CitiFinancial] ever tell you you would be able to obtain a lower interest rate but for the alleged bankruptcy notation?
A. Okay. I don't remember them saying anything like that.
. . .
Q. You don't remember one way or the other?
A. No, I can't remember.  But . . . .
Q. But what?
A. Okay. It wasn't on all three reports. Okay. The bankruptcy wasn't on all three reports, so it's possible that they used a report that, you know, wasn't on there. . . .
. . .
Q. Do you know what bureau was reporting the alleged bankruptcy?
A. I believe it was TransUnion.

*Id.* at 140-41.

The plaintiff filed her complaint in the Oakland County, Michigan circuit court on September 26, 2007.  The original complaint pleaded five counts: violation of the Michigan Collection Practices Act (count I), violation of the Fair Credit Reporting Act claim (count II), defamation(count III), intentional infliction of emotional distress claim (count IV), and violation of the Michigan Consumer Protection Act (count V).  Her first amended complaint contains those same counts.  In her proposed second amended complaint, she would dismiss count V.

The defendant filed a motion alternatively seeking judgment on the pleadings, dismissal, and summary judgment.   The defendant argues that the plaintiff has not pleaded all the necessary elements to support her federal claim in count II, and the state law claims are preempted by federal law and suffer from various other defects.

## II.

The proposed second amended complaint attached to the plaintiff's motion does not add new counts or theories for recovery.  Instead, the plaintiff wants to add factual allegations in three general areas.  First, Lynk would allege that a representative of Chase discouraged her from disputing the correctness of her credit report with credit reporting agencies and that she later hired Lexington

-7-

Legal, a law firm, which requested an investigation of the credit reporting agencies' files regarding the plaintiff.  The plaintiff's amended complaint alleges:

> That during a subsequent telephone conversation between Plaintiff and a representative of the Defendant, the Defendant advised Plaintiff that she did not need to contact a Credit Bureau, that instead Chase would look into the matter and take care of it.
> That subsequently, Plaintiff did hire a law firm that contacted the credit reporting agencies to dispute the bankruptcy entry on Plaintiff's credit report.

Second Am. Compl. ¶¶ 13-14.

Second, Lynk wants to eliminate the count of the complaint dealing with the Michigan consumer protection act stating that it is "not supported by current law."

Third, Lynk attempts to introduce facts about when she first learned about the bankruptcy notation on her record, but the new allegations conflict with her deposition testimony.  At her deposition, she testified that she found out about the bankruptcy notation in May of 2006, but the second amended complaint would allege that she found out about the bankruptcy in September of 2006.  Her second amended complaint suggests:

> In the course of attempting to refinance, Plaintiff learned in approximately September of 2006 that Defendant Chase has been falsely reporting to various credit reporting bureaus that Plaintiff has filed bankruptcy. . . .

Second Am. Compl. ¶ 9.

The defendant opposes the motion arguing that the amendment is futile, permitting amendment after the close of discovery would be prejudicial to the defendant, and the proposed amendments contradict Lynk's own testimony.

Motions to amend are governed by Federal Rule Civil Procedure 15(a), which states that a party may amend its pleadings at this stage of the proceedings only after obtaining leave of court. Although the Rule provides that "[t]he court should freely give leave when justice so requires,"

leave may be denied on the basis of undue delay, bad faith by the moving party, repeated failure to cure defects by previously-allowed amendments, futility of the proposed new claim, or undue prejudice to the opposite party. *Forman v. Davis*, 371 U.S. 178, 182 (1962); *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999); *Fisher v. Roberts*, 125 F.3d 974, 977 (6th Cir. 1997). "Notice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted." *Wade v. Knoxville Util. Bd.*, 259 F.3d 452, 458-59 (6th Cir. 2001). The Rule does not establish a deadline within which a party must file a motion to amend. *See Lloyd v. United Liquors Corp.*, 203 F.2d 789, 793 (6th Cir. 1953) (reviewing a district court's denial of a motion to amend after the entry of summary judgment).

Delay alone does not justify denial of a motion brought pursuant to Rule 15(a). *Sec. Ins. Co. of Hartford v. Kevin Tucker & Assocs., Inc.*, 64 F.3d 1001, 1009 (6th Cir. 1995). However, the party seeking to amend should "act with due diligence if it wants to take advantage of the Rule's liberality." *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306 (6th Cir. 2000) (citation omitted). Thus, where "amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier." *Wade*, 259 F.3d at 459. Under Rule 15(a), this Court has wide discretion to allow a party to amend a complaint. *See Benzon v. Morgan Stanley Distribs.*, 420 F.3d 598, 613 (6th Cir. 2005).

The defendant's main argument against the amendment is that it would be prejudiced since discovery is closed. However, the Court offered to extend discovery, and at oral argument the defendant conceded that it needed nothing further. The delay in the plaintiff's request to amend can be attributed to the poor performance of her prior attorney, who missed filing deadlines and court appearances and failed to communicate with her client. The allegation in the proposed second

-9-

amended complaint that conflicts with the plaintiff's deposition testimony is largely meaningless, since the pleading is not verified and the deposition testimony will prevail for the purpose of the summary judgment motion. Even if the allegation were verified, a subsequent sworn statement that directly contradicts a party's deposition testimony generally will be disregarded. *See Aerel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 907-08 (6th Cir. 2006). The Court, therefore, will allow the amendment, treat the second amended complaint as having been filed, and consider the defendant's motion in the context of the second amended complaint, which deletes count V.

III.

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) on the ground that the complaint does not state a cognizable claim is reviewed under the standards that govern motions brought under Rule 12(b)(6). See Fed. R. Civ. P 12(c); *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 761 (6th Cir. 2006); *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001). The defendant has moved alternatively for judgment on the pleadings and for summary judgment. Because it has attached and referred to matters outside the pleadings, the Court will treat the motion as one for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(b) (stating that "if, on a motion . . . to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56"); *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 533 (6th Cir. 2002) (quoting *Soper v. Hoben*, 195 F.3d 845, 850 (6th Cir. 1999)); *Kennedy v. R.W.C., Inc.*, 359 F. Supp. 2d 636, 640 (E.D. Mich. 2005) (recognizing that "[i]f matters outside the pleadings must be considered in ruling on the merits of the claim, as here, the motion more properly should follow the standards and procedures of Rule

-10-

56, and reviewing courts generally will treat the motion as one for summary judgment"); *Coal. to Defend Affirmative Action v. Regents of Univ. of Mich.*, 539 F. Supp. 2d 924, 944 (E.D. Mich. 2008). The defendant has filed a number of exhibits with its motion. These documents plainly are relevant to the defendant's motions and should be examined by the Court. Therefore, the Court will treat the motions as ones for summary judgment and apply the standards required by Rule 56.

A motion for summary judgment under Fed. R. Civ. P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine

-11-

issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002). Thus a factual dispute which "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). "[T]he party opposing the summary judgment motion must 'do more than simply show that there is some "metaphysical doubt as to the material facts."'" *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 564 (6th Cir.

-12-

2003) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994), and

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "Thus, the mere

existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there

must be evidence on which the jury could reasonably find for the plaintiff." *Ibid.* (quoting *Anderson*,

477 U.S. at 252) (internal quote marks omitted).

A.

Count I of the second amended complaint is brought under the Michigan Collection Practices

Act (MCPA).  The plaintiff alleges that the defendant violated that Act as follows:

> a) Making an inaccurate, misleading, untrue, or deceptive statement or claim in a
> communication or not revealing the purpose of a communication when it is made in
> connection with collecting a debt;

> b) misrepresenting in a communication with a Debtor the legal rights of the debtor,
> and

> c) using a harassing, oppressive, or abusive method to collect a debt, including
> causing a telephone to ring or engage a person in a telephone conversation
> repeatedly, continuously, or at unusual times or places.

Second Am. Compl. ¶ 22.  The complaint also alleges that the defendant's acts were wilful and

caused the plaintiff to "suffer[] the damages, including but not limited to, damage to her business

and community reputation, extreme mental distress, aggravation, humiliation and embarrassment,"

entitling the plaintiff to statutory damages, treble damages and attorney's fees as provided in the

MCPA.  Second Am. Compl. ¶ 24.

The defendant argues that this claim is preempted by section 625 of the Fair Credit Reporting

Act, codified at 15 U.S.C. § 1681t(b)(1)(F).  Further, according to Chase, the plaintiff lacks standing

to bring an action under the act because the act requires that a plaintiff suffer "an injury, loss, or

damage" as a predicate for asserting standing.  *See* Mich. Comp. Laws § 445.257(1).  Chase claims

-13-

that Lynk has not alleged  damages or out-of-pocket loss and admitted that the evidence of a

bankruptcy notation did not affect the terms of her loan with CitiFinancial.  The defendant also

contends that the plaintiff's mental anguish does not satisfy the injury required to bring a suit under

the collection practices act.  Finally, the defendant asserts that Lynk simply does not have evidence

of any misrepresentations to the credit bureaus or that Chase contacted Lynk excessively, or at

unreasonable times.

The Fair Credit Reporting Act (FCRA) contains two overlapping and potentially

contradictory preemption provisions.  *Stafford v. Cross Country Bank*, 262 F. Supp. 2d 776, 784-85

(W.D. Ky. 2003).  Section 1681h restricts a consumer from bringing common-law actions for false

or inaccurate credit reporting "except as to false information furnished with malice or willful intent

to injure such consumer." 15 U.S.C. § 1681h(e).  In 1996, Congress amended the FCRA and added

section 1681t(b)(1)(F), which provides, among other things, that "[n]o requirement or prohibition

may be imposed under the laws of any State . . . with respect to any subject matter regulated under

. . . section 1681s-2 of [the FCRA], relating to the responsibilities of persons who furnish

information to consumer reporting agencies. . . ." 15 U.S.C. § 1681t(b)(1)(F).  "The tension between

these two provisions therefore results from the fact that § 1681h(e) permits state tort claims, but

requires a higher standard of proof for those in the nature of defamation, slander, or invasion of

privacy, while § 1681t(b)(1)(F) prohibits all state claims covered by § 1681s-2."  *Stafford*, 262 F.

Supp. 2d at 785.

The Sixth Circuit has not yet addressed the scope of the preemption in either of these

statutes.  The district courts have employed four approaches in reconciling the two preemption

provisions, which are discussed at length in *Wolfe v. MBNA Am. Bank*, 485 F. Supp. 2d 874, 883-86

-14-

(W.D. Tenn. 2007).  For the purpose of the defendant's motion directed at count I, however, it is enough to observe that the essence of the claim deals with collection *practices*, not credit reporting, and neither section 1681h(e) nor section 1681t(b)(1)(F) addresses that subject matter.  Consequently, except for the allegation in paragraph 22(a) as to falsely reporting the bankruptcy, count I is not preempted by that federal legislation.  The claim in paragraph 22(a) is preempted because there is no allegation that the report was made with malice or willful intent to injure Ms. Lynk.

Moreover, the text of the MCPA does not address false communications made by a creditor to a credit reporting agency.  The MCPA's false communication provisions expressly refer to communications between a debtor and a creditor.  *See, e.g.*, Mich. Comp. Laws § 445.252(2)(a) (prohibiting "[c]ommunicating with a debtor in a misleading or deceptive manner"); § 445.252(2)(f) (prohibiting various misrepresentations, including misrepresentations about the legal status of a legal action "in a communication with a debtor"); § 445.252(2)(g) (prohibiting communicating with the debtor without disclosing caller's identity); § 445.252(2)(h) (communicating with the debtor who is represented by an attorney).  The MCPA is considered to be a "remedial statutory scheme designed to prohibit unfair practices in trade or commerce and must be liberally construed to achieve its intended goals." *Newton v. West*, 262 Mich. App. 434, 437, 686 N.W.2d 491, 493 (2004) (citation and internal quotation marks omitted).  But the text of the legislation makes clear that it is intended to protect consumers from harassment by creditors and third party collection agencies, and the statute expressly authorizes creditors' communications with credit reporting agencies in some cases.  *See, e.g.*, Mich. Comp. Laws § 445.252(2)(l) (prohibiting "[p]ublishing, causing to be published, or threatening to publish lists of debtors, *except for credit reporting purposes*, when in response to a specific inquiry from a prospective credit grantor about a debtor").  In this case, if any

-15-

false communications occurred, they occurred between the creditor and TransUnion, a credit reporting agency. Although those communications are covered by the FCRA, they are not addressed by the MCPA. Therefore, the plaintiff's claim based on Mich. Comp. Laws § 445.252(2)(f) fails as a matter of law.

The remaining allegations that the creditor harassed the plaintiff with repeated calls and that the creditor failed to implement adequate procedures to safeguard consumers against abuse, Mich. Comp. Laws §§ 445.252(2)(n), (q), fall within the statute's prohibitions. The record contains some evidence that Chase engaged in abusive collection practices. The plaintiff testified at her deposition that Chase's employees were "nasty" in their efforts to collect on the plaintiff's past due balances:

Q. I understand that you're not an attorney, but in your own words, can you explain what that means or what you're alleging?
A. Okay. They would call me every day, you know, I don't even know if it was sometimes more than once a day. Some of them were nice, some of them were very nasty. You know, some, you know, it was almost like they were enjoying the situation, you know. That's why I say that they did it on purpose, because some, you know, act like they were enjoying the power that they had over me.
You know, I was at their mercy. You would be at their mercy. Okay, they could have called, you know, for the full amount or whatever at any time. They told me that all the time. I got a letter from them all the time saying, you know, you owe this much, you know, and we can demand, you know, at any time, you know, full amount. You know, so I was at their mercy, and some of them were sweet as pie, but some of them enjoyed, you know, me being at their mercy. And they let me know that, you know –
Q. So in your own words, Chase would frequently contact you about the late payments or the payments that were due – overdue?
A. Okay. No. Okay. It wasn't the fact that they were contacting me; it was the – because you expect, you know, if you owe a debt for them to contact you. It was some of the way they contacted me, you know, it was their behavior in the way that they contacted me. Some of them acted like I said they were enjoying it, you know. I pleaded – I'm at their mercy and they were enjoying it.
Q. So, it was the way – I'm sorry.
A. Okay. It was the way in which they spoke to me. It was the way they act. You know, it was just, you know, just a nasty, like arrogant like way.

Lynk Dep. at 143-45.

-16-

Although the plaintiff admitted that Chase did not contact her during the hours of 9 p.m. through 8 a.m., *see* Lynk Dep. at 146-47, and did not elaborate on the exact words which triggered her characterization of the defendant's actions as "nasty," *see* Lynk Dep. at 145 ("I can't go back and recreate . . . what some of them said or how they were saying it. . . ."), the word "nasty" can relate to the quality of being "harassing, oppressive and abusive," which violates the statute.  In fact, the plaintiff elaborated that some Chase employee named Nicole screamed at her during one of the calls, although she admitted that she does not have any memories of Nicole cursing at her.  Lynk Dep. at 159.  The defendant is correct that having not shown that any of the calls were made during 9 p.m. through 8 a.m. period, the plaintiff does not benefit from the presumption of inconvenient time under Mich. Comp. Laws § 445.252(2)(n).  However, the record, although sparse, creates a question of fact on the issue whether Chase employees violated MCPA's prohibition on using abusive language.  The plaintiff's deposition testimony establishes that the defendant's employees were nasty to her, yelled at her, and were in contact with her on more than ninety occasions per year.

## B.

Chase argues that Lynk cannot prevail on count II of her amended complaint under the FCRA because there is no private right of action under section 1681s-2(a), and Lynk did not request an investigation of her credit with the credit bureaus to trigger liability under section 1681s-2(b).  Chase also argues that section 1681s-2(b) of the FCRA does not create a private cause of action.

-17-

The FCRA was enacted to "require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit . . . in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b). The duties imposed by the statute are twofold. Subsection (a) imposes responsibility upon furnishers of credit information to provide agencies with accurate credit information. 15 U.S.C. § 1681s-2(a). Subsection (b) of the statute imposes upon data furnishers the duty to conduct investigations and promptly report and correct inaccurate information upon the notice of dispute. 15 U.S.C. § 1681s-2(b)

There can be no doubt that the duties imposed by section 1681s-2(a) can only be enforced by government agencies and officials. *See* 15 U.S.C. §§ 1681s-2(c)(1), (d) (such violations "shall be enforced exclusively as provided under section 1681s of this title by the Federal agencies and officials and the State officials identified in section 1681s of this title"). Therefore, no private right of action exists under subsection (a). *See Stafford*, 262 F. Supp. 2d at 782-83.

Federal trial courts are split as to whether section 1681s-2(b) provides a private right of action. However, the Sixth Circuit in an unpublished decision held without discussion that there is a private right of action. *Bach v. First Union Nat. Bank*, No. 04-3899, 149 F. App'x 354, 358-59 (6th Cir. Aug. 22, 2005) ("While a consumer cannot bring a private cause of action for a violation of a furnisher's duty to report truthful information, a consumer may recover damages for a willful violation of 15 U.S.C. § 1681s-2(b) (1)(A)-(D).") (citing *Stafford*, 262 F. Supp. 2d at 782-83); *see also Downs v. Clayton Homes, Inc.*, Nos. 03-5259, 03-6055, 88 F. App'x 851, 853 (6th Cir. Feb.9, 2004) (unpublished) (assuming for purposes of motion that private right of action existed under

-18-

subsection (b)).  The majority of courts that have addressed the issue have concluded that 15 U.S.C. § 1681s-2(b) created a private right of action by a consumer against a data furnisher.  *See Sweitzer v. Am. Express Centurion Bank*, 554 F. Supp. 2d 788, 794 (S.D. Ohio 2008); *Khalil v. TransUnion, LLC*, No. 08-10303, 2008 WL 2782912, at *7 (E.D. Mich. July 17, 2008) (unpublished) (and cases cited therein).  A district court in the Northern District of Ohio has adopted the minority position that section 1681s-2(b) only applies to consumer reporting agencies.  *See Zamos II v. Asset Acceptance, LLC*, 423 F. Supp. 2d 777, 787-88 (N.D. Ohio 2006).  *But see Alarcon v. TransUnion Marketing Solutions, Inc.*, No. 5:07CV0230, 2008 WL 4449387, at *4 (N.D. Ohio Sept. 30, 2008) ("While a consumer cannot bring a private cause of action for a Data Furnisher's violation of its duty to report truthful information, a consumer may recover damages if a Data Furnisher violates its obligations, once notified of a dispute, under 15 U.S.C. 1681s-2(b)(1)(A)-(D).").  After canvassing the authority, this Court is persuaded that there is a private right of action to enforce the provisions of section 1681s-2(b) of the FCRA.

Under section 1681s-2(b), "[u]pon receiving notice from a credit reporting agency that a consumer disputes the information a furnisher has provided, the furnisher is required to (1) investigate the veracity of the disputed information; (2) review the information provided by the credit reporting agency; (3) report the results of the investigation; and (4) correct any inaccuracies uncovered by the investigation."  *Bach*, 149 F. App'x at 358 (citing 15 U.S.C. § 1681s-2(b)(1)(A)-(D)).  However, the Sixth Circuit has not yet addressed in a published opinion the question whether a data furnisher's obligations under section 1681s-2(b) mature when it receives notice of a dispute from a person other than a credit reporting agency.

Section 1681s-2(b)(1) states: "After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall . . . conduct an investigation with respect to the disputed information."  The specifics of the notice are described in section 1681i(a)(2):

> Before the expiration of the 5-business-day period beginning on the date on which a consumer reporting agency receives notice of a dispute from any consumer or a reseller in accordance with paragraph (1), the agency shall provide notification of the dispute to any person who provided any item of information in dispute, at the address and in the manner established with the person. The notice shall include all relevant information regarding the dispute that the agency has received from the consumer or reseller.

15 U.S.C. § 1681i(a)(2)(A).  In an unpublished opinion, the Sixth Circuit interpreted these statutes to limit a data furnisher's obligations to instances when notification comes from a credit reporting agency.  *Downs*, 88 F. App'x at 853-54 (holding that to recover under § 1681s-2(b) "the plaintiff must show that the furnisher received notice from a consumer reporting agency, not the plaintiff, that the credit information is disputed").  The Fifth Circuit agrees.  *Young v. Equifax Credit Info. Servs., Inc.*, 294 F.3d 631, 639 (5th Cir. 2002) (holding that "any private right of action Young may have under § 1681s-2(b) would require proof that a consumer reporting agency, like Equifax or CBLC, had notified Penney pursuant to § 1681i(a)(2)").  Most district courts that have considered this issue have reached the same conclusion.  *See Stafford*, 262 F. Supp. 2d at 783-84; *Lowe v. Surpas Res. Corp.*, 253 F. Supp. 2d 1209, 1253-54 (D. Kan. 2003) (collecting cases); *Aklagi v. Nationscredit Fin.*, 196 F. Supp. 2d 1186, 1193 (D. Kan. 2002); *Jaramillo v. Experian Info. Solutions, Inc.*, 155 F. Supp. 2d 356, 363 (E.D. Pa. 2001); *Yelder v. Credit Bureau of Montgomery, L.L.C.*, 131 F. Supp. 2d 1275, 1289 (M.D. Ala. 2001); *Dornhecker v. Ameritech Corp.*, 99 F. Supp. 2d 918, 928-29 (N.D.

Ill. 2000); *Larson v. Ford Credit*, No. 06-CV-1811, 2007 WL 1875989, at *10 (D. Minn. June 28, 2007).

Based on the statutory text, this Court as well adopts the conclusion that "a furnisher of credit information . . . has no responsibility to investigate a credit dispute until after it receives notice *from a consumer reporting agency*." *Stafford*, 262 F. Supp. 2d at 783-84 (emphasis added). In this case, there is no evidence that Chase received notice of a dispute from TransUnion or any other credit reporting agency. In fact, there is not evidence that the plaintiff or anyone on her behalf contacted TransUnion about the erroneous information until Lexington Legal wrote on April 27, 2007, over a month *after* Chase had notified four credit reporting agencies, including TransUnion, of the erroneous information and effectuated a correction. Because the plaintiff has not offered proof that Chase violated any of its duties under 15 U.S.C. § 1681s-2(b)(1) after it received the notification required by the statute, the plaintiff's claim under the FCRA fails as a matter of law.

C.

Chase also argues that the plaintiff's defamation claim in count III is preempted by the FCRA and it was filed out of time. The Court need not address the preemption argument, because the Court agrees that the claim is barred by the statute of limitations.

Under the applicable statute of limitations, the plaintiff had one year from the time the claim first accrued to bring a defamation action. Mich. Comp. Laws §§ 600.5805(1), (9). A defamation claim accrues when the defamatory statement is first made, and "[t]he statute does not contemplate extending the accrual of the claim on the basis of republication, regardless of whether the republication was intended by the speaker." *Mitan v. Campbell*, 474 Mich. 21, 25, 706 N.W.2d 420, 422 (2005). This rule includes republication by a third party. The plaintiff learned of the

-21-

bankruptcy notation on her credit report file in May of 2006, when she contacted "Mike" of the Wilmington Mortgage. She had one year since that time to initiate her action. She did not file her complaint until September 26, 2007. The plaintiff has not developed any theory under which the statute of limitations could be tolled, such as fraudulent concealment, *see Arent v. Hatch*, 133 Mich. App. 700, 705-06, 349 N.W.2d 536, 539 (1984), and the record does not suggest one based on the information provided. Therefore, the Court concludes that the defamation claim is barred by the applicable statute of limitations.

### D.

Finally, the defendant argues that the intentional infliction of emotional distress claim in count IV is preempted by the FCRA, and that its conduct was not so outrageous and extreme in degree as to go beyond all possible bounds of decency. Once again, the Court agrees with Chase's second argument.

To prevail on her claim of intentional infliction of emotional distress, the plaintiff must prove four elements: extreme and outrageous conduct, intent or recklessness on the part of the defendant, causation between the defendant's actions and the plaintiff's injuries, and severe emotional distress she suffered. *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 602, 374 N.W.2d 905, 908 (1985). Proof of extreme and outrageous conduct requires more than evidence of tortious or malicious actions, or even actions with criminal intent or those entitling the plaintiff to recovery of punitive damages. Rather, as the Restatement puts it, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the

community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"

*Id.* at 603, 374 N.W.2d at 908-09 (citing Restatement (Second) of Torts § 46).

> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

*Ibid.* (quoting Restatement (Second) of Torts § 46, cmt. d., pp. 72-73).

Considering the high degree of outrage traditionally required to meet the first element of the cause of action, the majority of courts have not found that conduct relating to debt collecting or credit reporting amounts to "extreme and outrageous conduct." *See, e.g., Arikat v. J.P. Chase & Co.*, 430 F. Supp. 2d 1013, 1027-28 (N.D. Cal. 2006); *Jolly v. Acad. Collection Serv., Inc.*, 400 F. Supp. 2d 851, 867 (M.D.N.C. 2005); *Richardson v. Fleet Bank of Mass.*, 190 F. Supp. 2d 81, 90 (D. Mass. 2001); *Evans v. Credit Bureau*, 904 F. Supp. 123, 127 (W.D.N.Y. 1995). Courts that do find extreme and outrageous conduct in the creditor's false reporting usually deal with a situation in which a creditor knew that the debt has been satisfied but still reported negative information to credit reporting agencies and attempted to collect the paid balance through other efforts. *See, e.g., Kindley v. Flagstar Bank*, No. 04-0319, 2004 WL 5631084, at *3 (S.D. Cal. Oct. 28, 2004) (finding that a plaintiff stated a claim of intentional infliction of emotional distress where she alleged that the bank "engaged in a systematic and mean-spirited effort to collect a debt from plaintiff, even though [the bank] knew that plaintiff had already paid the debt"). Although Michigan courts have not dealt with this particular problem, one Michigan court has found that where school officials falsely identified several teachers as having criminal convictions based on the matches in the criminal history system,

-23-

the plaintiffs failed to state a claim for intentional infliction of emotional distress.  *See Frohriep v. Flanagan*, 278 Mich. App. 665, 683, 754 N.W.2d 912, 924 (2008), *rev'd on other grounds*, 483 Mich. 920, 763 N.W.2d 279 (2009).

In light of this standard, the Court concludes that the plaintiff has not demonstrated the existence of a material fact on the first element of her claim in count IV.  The plaintiff did not allege that Chase engaged in a outrageous or illegal behavior to collect its debt.  Chase's allegedly erroneous report of her bankruptcy to credit reporting agencies does not qualify as "extreme and outrageous behavior" as a matter of law.  Although the plaintiff posits that the bank's behavior was "willful," she has not produced any facts to support her conclusory incrimination.

Nor has the plaintiff satisfied the last element of the cause of action requiring proof of severe emotional distress.

> Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like.  It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea.  It is only where it is extreme that the liability arises.  Complete emotional tranquillity is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people.  The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.

*Roberts*, 422 Mich. at 608-09, 374 N.W.2d at 911 (quoting Restatement (Second) of Torts, § 46 cmt. j., p. 77).  In the absence of a physical injury, the threshold is even higher, requiring distress "more in the way of outrage."  *Ibid.* (quoting Restatement (Second) of Torts, § 46, cmt. k, p. 78).

The plaintiff described her reaction to her encounter with Chase in her deposition as follows:

> I went through Chase calling me every single day.  Like I said, with several people on the line, listening as I groveled. . . . All of my utilities are up-to-date now, okay, but they were calling me.  It's like I had to grovel to them and please don't turn this off, please don't turn that off.  It's like a nightmare.  It's like, you know, just an unimaginable nightmare.

-24-

> . . .
>
> . . . I don't know to what extent, you know, my health – I have some health issues now that, you know, I don't know to what extent, you know, I would – my, you know, my body was damaged because from just the sheer stress, I mean sheer – total stress in that situation.
>
> . . .
>
> Because, of course, there will always be emotional how dare you, how dare you. I couldn't feed my kids. My kids were like three and six - no, not three and six, like - I can't remember how old they were. Like four and - probably four and seven. I couldn't feed them, you know, we just couldn't eat, you know. I had to send Chase the money and we couldn't eat and Chase was still calling me. And this wasn't for one or two or three days, this was for a year. I mean, this was for a year that, you know, I'm looking at my kids, I can't feed you because I'm sending to Chase two mortgage payments.
>
> . . .
>
> It's no different than if I was, you know, if I was robbed. If somebody came into my home and robbed me, I would still have scars. I would still be, you know, thinking about all this happen and that happen, you know, scars would still be here. The fact that some of these people were grinning in my face, the fact that somebody put in my credit report that I was in bankruptcy, you know, how can you walk away from that and say, okay, that's fine, okay. How can you just walk away from that.

Lynk Dep. at 158-61.

Plainly, the plaintiff experienced an emotionally difficult time, given the sudden loss of her husband and her severe financial hardship. It is not clear that all distress flowed from the bankruptcy notation on her record or Chase's collection efforts. However, the Court is convinced that the level of distress required by the Michigan cases to establish that element of an intentional infliction of emotional distress claim is absent from this record. Therefore, the Court concludes that his claim fails as a matter of law.

## IV.

The Court concludes that the plaintiff may file a second amended complaint. Reviewing that complaint, the Court finds that the part of count I brought under the Michigan Collection practices Act alleging that Chase made a false report to a credit reporting agency is preempted by federal law,

but fact questions precludes dismissal of the balance of that claim.  The claims in counts II through IV must fail as a matter of law.  The plaintiff has withdrawn count V.

Accordingly, it is **ORDERED** that the plaintiff's motion for leave to file a second amended complaint [dkt #38] is **GRANTED**, and the second amended complaint is deemed filed.

It is further **ORDERED** that the defendant's motion for summary judgment [dkt #19] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the allegation in paragraph 22(a) and counts II through IV of the second amended complaint are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that counsel for the parties shall appear for a status conference on **August 18, 2009 at 10:00 a.m.** to discuss further proceedings in this litigation.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  July 29, 2009

| **PROOF OF SERVICE** |
|---|
| The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 29, 2009. |
| s/Lisa M. Ware |
| LISA M. WARE |

-26-